WILLIS G. BRIGGS v. CITY OF RALEIGH ET AL.

(Filed 22 February, 1928.)

**1. Taxation—Constitutional Restrictions—Taxation for Public Purpose—Constitutional Law—Legislative Powers.**

The Legislature is without Constitutional power to levy a tax or donate State property for any other than a public purpose, and the criterion for this question is whether the purpose aids the public through the prosperity of a class, or whether the public generally and directly will be helped.

**2. Same—Municipal Corporations—Bonds.**

A municipality is without power to issue bonds or levy a tax for other than public municipal purposes.

**3. Same—State Fair.**

*Held*, under the facts of this case, the donation of land by the Legislature for a State Fair is for a public purpose, and is constitutional.

**4. Same.**

*Held*, under the facts of this case, the voting of bonds by a municipal corporation for the purpose of erecting buildings, etc., on land donated by the State, to be used for a State Fair to be operated within five miles of the municipality, is for a public municipal purpose, and is within the power of the city.

**5. Statutes—Construction—Presumption of Constitutionality—Taxation —Municipal Bonds.**

Where the validity of a legislative act donating State lands, and the issuance of municipal bonds is in doubt, the doubt will be resolved in favor of the will of the people as expressed by the Legislature and the vote of the citizens to be taxed.

APPEAL by plaintiff from *Moore, Special Judge,* at Chambers, 5 December, 1927. From WAKE.

Controversy without action submitted on an agreed statement of facts, to determine the validity of certain proposed bonds of the city of Raleigh.

The Legislature at its last session, chapter 209, Public Laws 1927, dedicated and set apart two hundred acres of the State's land, situate within five miles of the State capitol, the particular acreage to be selected by the Governor and Council of State, for the purpose of holding annually a State Fair and Exposition, such as will properly represent the agricultural, manufacturing, industrial and other interests of the State: *Provided,* the city or citizens of Raleigh and the North Carolina Agricultural Society (C. S., 4936) donate not less than two hundred thousand dollars to be used in the erection of buildings, or proper development of the fair grounds, and the conducting of a fair thereon.

It is further provided in said act that the State Fair or Exposition so authorized shall be managed, operated and conducted by a board of directors consisting of one representative from each Congressional district in the State and three representatives from the State at large, such representatives to be appointed by the Governor, together with the following *ex officio* members of such board of directors: The Governor of North Carolina, *ex officio* chairman, Commissioner of Agriculture, President of the North Carolina State College of Agriculture and Engineering, the Director of the State Department of Conservation and Development, and the Mayor of the City of Raleigh.

At the same session of the Legislature, chapter 210, Private Laws 1927, the commissioners of the city of Raleigh were authorized and empowered, with the approval of a majority of the qualified voters of said city, to issue municipal bonds in a sum not to exceed $75,000, "and donate and contribute the proceeds of the same to the State for the purpose of assisting in the establishment and maintenance of a State Fair in the vicinity of Raleigh, under the conditions and provisions contained in chapter 209, Public Laws 1927."

A special election was duly called and held in the city of Raleigh on 26 July, 1927, at which said election a majority of the qualified voters, newly registered for said election (C. S., 2948), voted in favor of the issuance of the bonds to the amount of seventy-five thousand dollars.

From a judgment holding the bonds in question to be valid obligations of the city of Raleigh and denying the prayer for injunctive relief, the plaintiff appeals, assigning errors.

*Barwick & Leach for plaintiff.*
*Clifton W. Beckwith and Albert L. Cox for defendants.*

STACY, C. J. The primary rôle of municipal government is that of a protector of rights and not a giver of gifts, but if the end in view be a public municipal one, it is the general holding that a city may aid by donation, in proper instances, as well as by other means of assistance. *Cox v. Comrs.,* 146 N. C., 584, 60 S. E., 516; *Wood v. Oxford,* 97 N. C., 227, 2 S. E., 653. Albeit there can be no lawful tax which is not laid for a public purpose. *Loan Asso. v. Topeka,* 87 U. S., 655; *Comrs. v. State Treasurer,* 174 N. C., 141, 93 S. E., 482. "It is well settled that moneys for other than public purposes cannot be raised by taxation, and that exertion of the taxing power for merely private purposes is beyond the authority of the State." *Jones v. City of Portland,* 245 U. S., 217. And in case of a city or municipality the tax, to be valid, must be for a city or municipal purpose, in a legal sense, as well as for a public one. Cooley on Taxation, Vol. I (4 ed.), sec. 126. That is,

the objects to be attained must affect the people as a community and not merely as individuals. Cooley's Const. Limit., 531.

The appeal, therefore, presents two questions not heretofore decided in this jurisdiction: 1. Is a State Fair, such as described in the two statutes above mentioned, to be held annually under the supervision of the State, a public undertaking? 2. If so, is its location or retention within the vicinity of Raleigh, not more than five miles from the State capitol, a public municipal purpose for which a donation of $75,000 and more of public funds may be authorized by a favorable vote of a majority of the qualified voters of the city of Raleigh?

A negative answer to either one of these questions would require a reversal of the judgment, but if both are answered in the affirmative, it is conceded that the judgment should be upheld.

If we are to follow the clear weight of authority in other jurisdictions, where similar matters have been considered by the courts, the first question may readily be answered in the affirmative. Cooley on Taxation, Vol. I (4 ed.), sec. 203, and authorities there cited.

Speaking to the subject in *Kentucky Live Stock Breeders Association v. Hager,* 120 Ky., 125, 85 S. W., 738, where a legislative appropriation for a State Fair was upheld, *Hobson, C. J.,* delivering the opinion of the Court, said: "It is also insisted that a State Fair is not a public purpose for which the money of the State may be appropriated by the Legislature, and that the act merely gives a bounty of $15,000 to appellant. The appropriation to the World's Fair was sustained by this Court *(Norman v. Board of Managers,* 93 Ky., 537, 14 Ky. Law Rep., 529; 20 S. W., 901, 18 L. R. A., 556); and, if the Legislature may appropriate money in aid of a fair held in another State, to properly represent the State in such a fair, it is hard to see how a fair held within the State, to make an exhibit of the products of the State, is not equally a public purpose. Such legislation has been sustained by the current of authority in the other states of the Union having Constitutions substantially the same as ours. *(Daggett v. Colgan,* 92 Cal., 53, 28 Pac., 51, 14 L. R. A., 474, 27 Am. St. Rep., 95; *State v. Cornell* (Neb.), 74 N. W., 41, 39 L. R. A., 513, 68 Am. St. Rep., 629; *Sharpless v. Mayor of Philadelphia,* 21 Pa., 147, 59 Am. Dec., 759; *City of Minneapolis v. Janney* (Minn.), 90 N. W., 312; *Downing v. Indiana State Board of Agriculture,* 129 Ind., 443, 28 N. E., 123, 614, 12 L. R. A., 664; *Shelby County v. Tennessee Centennial Exposition* (Tenn.), 36 S. W., 694, 33 L. R. A., 717; *Bennington v. Park,* 50 Vt., 178.)"

The purpose and design of a State fair is to promote the general welfare of the people, advance their education in matters pertaining to agriculture and industry, increase their appreciation for the arts and the sciences, and bring them in closer touch with many things which

otherwise might remain in reserve or "caviare to the general," to borrow an expressive phrase from Shakespeare's Hamlet.

The second question may likewise be answered in the affirmative, if we are to follow the general current of authority on the subject, though it is conceded that the decisions in this respect are variant. Note: L. R. A., 1917 E, 845.

Some diversity of opinion may well be expected in a matter of this kind, where the question presented, as it is here, is susceptible to more than one view. Indeed, the line which separates community interests from those that are nonmunicipal, especially where the latter result in benefit to the local public, is not always easy to plot. Quite the reverse. On this subject *Cooley, J.,* says: "Public and private interests are so commingled in many cases that it is difficult to determine which predominates; and the question whether the public interest is so distinct and clear as to justify taxation is often embarrassing to the Legislature, and not less so to the judiciary. All attempts to lay down general rules whereby the difficulties may be solved have seemed, when new and peculiar cases arose, only to add to the embarrassment instead of furnishing the means of extrication from it." Cooley on Taxation, Vol. I (4 ed.), sec. 175.

Many objects may be public in the general sense that their attainment will confer a public benefit or promote the public convenience, but not be public in the sense that the taxing power of the State may be used to accomplish them. *Waples v. Marrast,* 108 Tex., 5, 184 S. W., 180. However, the term "public purpose" is not to be construed too narrowly. *Weismer v. Village of Douglas,* 64 N. Y., 91. It is not necessary, in order that a use may be regarded as public, that it should be for the use and benefit of every citizen in the community. It may be for the inhabitants of a restricted locality, but the use and benefit must be in common, and not for particular persons, interests or estates. *Ross v. Davis,* 97 Ind., 83; *Coster v. Tidewater Co.,* 18 N. J. Eq., 68; *Soens v. City of Racine,* 10 Wis., 271.

Animadverting on the subject in *Town of Bennington v. Park et al.,* 50 Vt., 178, *Powers, J.,* delivering the opinion of the Court, well says:.

"No formula has yet been devised by which to determine what is or is not a public use or purpose within the meaning of the constitutional prohibition; but it is clear that the ultimate advantage of the public as contradistinguished from that of the individual, is its characteristic feature. It is true that a proposed work may be of great utility to both the public and the individual, and still, according to circumstances, be either public or private in its character and quality. Men set up systems of government in order to subserve certain public ends, and reach advantages that could not otherwise be made available. The State is

clothed with the trust of answering these ends. It is not to be limited to the mere duty of governing the people by the exercise of its police power, but it has a higher duty to promote, the educational interests of the people, encourage their industrial pursuits, develop its material resources, and foster its commercial interests, by providing all reasonable facilities demanded by a prudent regard for the growth, development, and general prosperity of a free people; and the State is not to be tied down to any narrow and merely utilitarian policy in promoting the prosperity of its citizens. The problem is not how little, but how much, can be done to elevate the people to the highest plane of material and political prosperity. Schools, colleges, charitable and reformatory institutions, institutions for the development of the arts and sciences, roads, bridges, canals, and countless other internal improvements, have been established and constructed at the public expense by all thrifty States, ancient and modern, and no serious question has been made as to the propriety of such expenditures."

After mature reflection, we are constrained to place the present proposition in the category of a public municipal purpose, though it is confessed that much might be said in favor of locating it in another field. *Adams v. Durham,* 189 N. C., 232, 126 S. E., 611; *Wasson v. Commissioners of Wayne County,* 49 Ohio State, 622, 32 N. E., 472. Where the question is doubtful, as it is here, and the Legislature has decided it one way and the people to be taxed have approved that decision, it is the general rule of construction that the will of the law-makers, thus expressed and approved, should be allowed to prevail over any mere doubt of the courts. *Livingston v. Darlington,* 101 U. S., 407. It is only when the unconstitutionality of an act of the Legislature is clear that the courts, in the exercise of their judicial powers, are required to hold it for naught. Hence, every presumption is indulged in favor of the validity of the legislation called in question. *S. v. Yarboro,* 194 N. C., 498; *S. v. Revis,* 193 N. C., 192, 136 S. E., 346; *S. v. Manuel,* 20 N. C., p. 154.

"To justify a court in declaring a tax invalid on the ground that it was not imposed for the benefit of the public, the absence of a public interest in the purpose for which the money is raised by taxation must be so clear and palpable as to be immediately perceptible to every mind." *Norval, J.,* in *S. v. Cornell,* 53 Neb., 556, 74 N. W., 59, 39 L. R. A., 513, 68 Am. St. Rep., 629. Or as said by the Supreme Court of Illinois: "The inquiry into the validity of an act of the Legislature is an inquiry whether the will of the people as expressed in the law, is or is not in conflict with the will of the people, as expressed in the Constitution; and unless it be clear that the Legislature has transcended its authority, the courts will not interfere." *Lane v. Dorman,* 4 Ill., 238.

BRIGGS *v.* RALEIGH.

It should be observed, however, that we are dealing with the very fundamentals of government. The power to tax *only for a public purpose,* and not arbitrarily, is one of the chief distinctions between representative government and autocracy; and unless this difference is to be observed, the tyranny of the one, in matters of taxation, may become just as burdensome as the tyranny of the other. Every citizen has a right to insist that no majority, however large, shall take his property, under the guise of taxation or otherwise, for strictly private uses or for objects which do not concern the public welfare. Indeed, it is well settled by all the decisions on the subject, with none to the contrary, that the power of taxation may not be employed for the purpose of establishing, aiding or maintaining private business enterprises, whose sole object is the individual gain of the proprietors, no matter how beneficial to the community such enterprises may be. *People v. Parks,* 58 Cal., 624; *Allen v. Jay,* 60 Me., 124, 11 Am. St. Rep., 185. The attempted exercise of the taxing power for such purposes was long ago characterized as taxation "to load the tables of the few with bounty that the many may partake of the crumbs that fall therefrom." *Opinion of Justices,* 58 Me., 590-603. However important it may be to the community that individual citizens should prosper in their industrial enterprises, it is not the business of government to aid them with its means. *Parkersburg v. Brown,* 106 U. S., 487; *English v. People,* 96 Ill., 566; *Bank v. Iola,* 9 Kan., 689.

It follows, from what is said above, that the validity of a contract of a municipal corporation, which can only be fulfilled by resort to taxation, depends upon the power and authority of the municipality to levy a tax for the purpose for which the money is to be used. *Manning v. City of Devils Lake,* 13 N. Dak., 47, 99 N. W., 51, 112 Am. St. Rep., 652. The right to tax depends upon "the ultimate use, purpose and object for which the fund is raised." *Sharpless v. Philadelphia,* 21 Pa. St., 147, 59 Am. Dec., 759. There is no power to tax for an object not within the purposes for which governments are established. *State ex rel. Owen v. Donald,* 160 Wis., 21, 151 N. W., 331.

The reasons sustaining this position are so well stated in *Lowell v. City of Boston,* 111 Mass., 454, 15 Am. Dec., 39, which has been cited with approval in every jurisdiction, that we quote somewhat at length from the opinion of *Wells, J.,* in that case:

"The power to levy taxes is founded on the right, duty and responsibility to maintain and administer all the governmental functions of the State, and to provide for the public welfare. To justify any exercise of the power requires that the expenditure which it is intended to meet shall be for some public service, or some object which concerns the public welfare. The promotion of the interests of individuals, either in respect to property or business, although it may result incidentally in the ad-

vancement of the public welfare, is, in its essential character, a private and not a public object. However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental. The incidental advantage to the public, or to the State, which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation, or for which taxation may become necessary. It is the essential character of the direct object of the expenditure which must determine its validity, as justifying a tax, and not the magnitude of the interests to be affected, nor the degree to which the general advantage of the community, and thus the public welfare, may be ultimately benefited by their promotion.

"The principle of this distinction is fundamental. It underlies all government that is based upon reason rather than upon force. . . . The power of the government, thus constituted, to affect the individual in his private rights of property, whether by exacting contributions to the general means, or by sequestration of specific property, is confined, by obvious implication as well as by express terms, to purposes and objects alone which the government was established to promote, to wit, public uses and the public service. This power, when exercised in one form, is taxation; in the other, is designated as the right of eminent domain. The two are diverse in respect of the occasion and mode of exercise, but identical in their source, to wit, the necessities of organized society; and in the end by which alone the exercise of either can be justified, to wit, some public service or use. It is due to their identity in these respects that the two powers, otherwise so unlike, are associated together in the same article. So far as it concerns the question what constitutes public use or service that will justify the exercise of these sovereign powers over private rights of property, which is the main question now to be solved, this identity renders it unnecessary to distinguish between the two forms of exercise, as the same tests must apply to and control in each. An appropriation of money raised by taxation, or of property taken by right of eminent domain, by way of gift to an individual for his own private uses exclusively, would clearly be an excess of legislative power. The distinction between this and its appropriation for the construction of a highway, is marked and obvious. It is independent of all considerations of resulting advantage. The individual, by reason of his capacity, enterprise or situation, might be enabled to employ the money or property thus conferred upon him in such a manner as to furnish employment to great numbers of the community, to give a needed impulse to business of various kinds, and thus promote the general prosperity and welfare. In this view, it might be shown to be for the public good to take from the unenterprising and

thriftless their unemployed capital and entrust it to others who will use it to better advantage for the interests of the community. But it needs no argument to show that such arbitrary exercise of power would be a violation of the constitutional rights of those from whom the money or property was taken, and an unjustifiable usurpation."

As above indicated, we are not disposed to overturn the action of the Legislature in the instant case, sanctioned, as it is, by a vote of the people primarily liable for the bonds and necessarily affected by the tax. The determination of what is and what is not a public purpose belongs, in the first instance, to the legislative department. *State ex rel. Douglas County v. Cornell,* 53 Neb., 556, 74 N. W., 59, 39 L. R. A., 513, 38 Am. St. Rep., 629; *State v. Nelson County,* 1 N. D., 88, 45 N. W., 33, 8 L. R. A., 283, 26 Am. St. Rep., 609. But we would not be understood as holding that the legislative determination of the matter is conclusive. *Carman v. Hickman County,* 185 Ky., 630, 215 S. W., 408. In its final analysis it is a question for the courts.

Speaking to the subject in *Loan Association v. Topeka,* 87 U. S., 655, *Mr. Justice Miller,* delivering the opinion of the Court, very forcibly says:

"The theory of our governments, State and National, is opposed to the deposit of unlimited power anywhere. The executive, the legislative, and the judicial branches of these governments are all of limited and defined powers.

"There are limitations on such power which grow out of the essential nature of all free governments. Implied reservations of individual rights, without which the social compact could not exist, and which are respected by all governments entitled to the name. . . .

"Of all the powers conferred upon government, that of taxation is most liable to abuse. Given a purpose or object for which taxation may be lawfully used, and the extent of its exercise is in its very nature unlimited. It is true that express limitation on the amount of tax to be levied or the things to be taxed may be imposed by constitution or statute, but in most instances for which taxes are levied, as the support of government, the prosecution of war, the National defense, any limitation is unsafe. The entire resources of the people should in some instances be at the disposal of the government.

"The power to tax is, therefore, the strongest, the most pervading of all the powers of government, reaching directly or indirectly to all classes of the people. It was said by *Marshall, C. J.,* in the case of *McCulloch v. The State of Maryland,* 4 Wheaton, 431, that the power to tax is the power to destroy. . . . This power can as readily be employed against one class of individuals and in favor of another, so as

to ruin the one class and give unlimited wealth and prosperity to the other, if there is no implied limitation of the uses for which the power may be exercised.

"To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals to aid private enterprise and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation. This is not legislation. It is a decree under legislative forms."

The regularity of the election, at which the bonds in question were approved by a majority of the newly registered voters of the city of Raleigh was originally raised on the record, without any discussion of the question on brief. For this reason, additional briefs were invited, but as the parties do not regard the question as moot, we confine our decision to other matters. *Hill v. Skinner,* 169 N. C., 405, 86 S. E., 351; *Rigsbee v. Durham,* 98 N. C., 81, 3 S. E., 749.

Affirmed.